# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

BURLINGTON GRAPHICS SYSTEMS, INC.,

        Plaintiff,

    v.                          Case No.  11-C-0387

RITRAMA, INC.,

        Defendant.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 33)

Burlington Graphics Systems, Inc. ("BGS") sues Ritrama, Inc., claiming that adhesive-coated cast vinyl that Burlington bought from Ritrama was defective. Burlington asserts claims for breach of express warranties (count I), breach of implied warranties (count II), breach of contract (count III), and estoppel and waiver (count IV).

Ritrama moves for partial summary judgment, seeking dismissal of Burlington's claim for consequential damages, a limitation on any damages to replacement value of goods, dismissal of count II (breach of implied warranties), and dismissal of count III (breach of contract).

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this

burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

## UNDISPUTED FACTS

The following facts are either undisputed or taken in the light most favorable to BGS as the nonmovant. Unless otherwise noted by reference to the responding paragraph, a proposed statement of material fact was undisputed by the opposing party in its response. Any proposed statements from the parties not referenced by the court were determined to be irrelevant, Ritrama's version of a disputed fact, impermissible argument or a legal conclusion.

2

Ritrama is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota, and a manufacturing facility in Cleveland, Ohio.[1] (Doc. 35, ¶ 1.) The Minneapolis facility manufactures pressure-sensitive flexible films while the Cleveland facility manufactures cast-vinyl films products. (Doc. 35, ¶ 2.) End uses of Ritrama's products include labels for health and beauty products, food and beverage containers, outdoor signage and graphics, promotional graphics, and vehicle graphics. (Doc. 35, ¶ 2.)

BGS is a small, employee-owned, Wisconsin corporation with its principal place of business in Racine, Wisconsin. BGS designs and manufactures products including pressure-sensitive decals used for graphics on motor homes and other recreational vehicles ("RVs"). (Doc. 35, ¶ 3; Doc. 41, ¶ 1.) BGS's expertise includes skill or knowledge in ink; the application of ink; the application of ink to various substrates; and understanding reactions between ink, vinyl, and adhesive. (Doc. 35, ¶ 32; Doc. 45, ¶ 32.)

BGS began purchasing calendared (lower grade) vinyl and polyester products from Ritrama in 1997. These products were manufactured by Ritrama's Minneapolis facility in 1997. (Doc. 35, ¶ 4; Doc. 45, ¶ 4; Doc. 36, Ex. A at 14–15; Doc. 39, Ex. A.)

In 2005, BGS's most important customer was Keystone RV Company, located in Indiana. (Doc. 41, ¶ 3.) At that time, BGS was supplying decals for the exterior graphics on approximately eighty percent of Keystone's product line. (Doc. 41, ¶ 4.)

In December 2005, Keystone directed BGS to use Ritrama cast vinyl products to manufacture the decals that Keystone purchased from BGS. (Doc. 35, ¶ 5; Doc. 41, ¶ 5.) Previously, BGS had sourced its cast vinyl adhesive products from Avery Dennison. (*See*

---

[1]Ritrama is the United States subsidiary of Ritrama S.p.A., an Italian corporation. (Doc. 41, ¶ 2.)

3

Doc. 35, ¶ 9.)  It was apparent to BGS, and BGS understood, that it would lose Keystone's business if it did not switch from Avery Dennison to Ritrama for cast vinyl products.  (Doc. 35, ¶ 7; Doc. 41, ¶ 7.)  Keystone wanted BGS to move away from the Avery-Dennison-supplied material because of adhesion problems that were experienced at Keystone's plants during cold weather.  (Doc. 35, ¶ 8; *see* Doc. 41, ¶ 5.)  In connection with its directive, Keystone supplied BGS with a sample of the Ritrama cast vinyl product that it wished to use; Keystone had obtained the sample from a competitor of BGS named Graphix Unlimited.  (Doc. 35, ¶ 6; Doc. 41, ¶ 6.)

The cast vinyl products that BGS looked to purchase from Ritrama were comprised of a thin layer of cast vinyl film coated with an adhesive, produced in rolls of various lengths.  (*See* Doc. 35, ¶ 10.)  BGS would process the cast vinyl into graphic decals by die-cutting specific shapes and, for color graphics, printing the vinyl with ultra-violet ink, applying a clear coat, and applying a premask product to protect the printed film during installation.  (Doc. 35, ¶ 11.)

BGS approached Ritrama with the cast vinyl sample from Keystone and asked to purchase the same product.  (Doc. 35, ¶ 12.)  BGS reached out to Ritrama sales representative Tom Wenzel, who was located in Illinois, when BGS sought to purchase the cast vinyl product.  (Doc. 41, ¶ 8.)  Wenzel traveled to Wisconsin to meet with BGS.  (Doc. 41, ¶ 8.)  BGS informed Wenzel that it was interested in buying the same product as the Graphix sample from Keystone.  (*See* Doc. 36, Ex. A at 16 (indicating that BGS's President handed Ritrama's representative the sample and said "we would like to buy this product"; Doc. 44, Ex. 2 at 16 (same).)  BGS told Ritrama that the application was for Keystone and

4

that the sample had come from Graphix so Ritrama could identify the product. (Doc. 41, ¶ 9; Doc. 47, ¶ 9.) BGS's President, Mark Edwards, told Wenzel that the vinyl material would be printed and used in the RV market. (Doc. 42, ¶ 7.) Ritrama was aware that the material would be used in the RV market and that BGS would print and process the material to manufacture decals. (Doc. 41, ¶ 11; Doc. 47, ¶ 11; Doc. 44, Ex. 4 at 107–08.)

BGS was aware of Ritrama's presence in the RV market and expected to purchase premium cast vinyl. (Doc. 41, ¶ 10.) BGS's Edwards says BGS relied on Ritrama to furnish a vinyl appropriate for use in the RV market, based on Ritrama's superior knowledge of its vinyl products and Ritrama's experience supplying vinyl to the RV market. (Doc. 41, ¶ 11; Doc. 47, ¶ 11; Doc. 43, ¶ 7.)

In response to BGS's requests, Ritrama provided two samples of its 670-series cast vinyl—one with a "480" adhesive and one with a "720" adhesive. (Doc. 35, ¶ 13; Doc. 41, ¶ 12.) BGS conducted a single set of "initial adhesion" tests on both samples at one of the Keystone assembly plants. (Doc. 35, ¶ 14; Doc. 45, ¶ 14; Doc. 41, ¶ 13.) This test measured the strength of the initial bond of the decal to the RV. (Doc. 35, ¶ 15.) The purposes of BGS's initial adhesion testing were to test the bond of the decal to the RV and to confirm that the material BGS was obtaining from Ritrama was the same material Ritrama was supplying to Graphix. (Doc. 35, ¶ 16; Doc. 45, ¶ 16; Doc. 41, ¶ 67; Doc. 47, ¶ 67.)

On December 5, 2005, Ritrama faxed to BGS, from Ritrama's Cleveland facility, a 670 Series Opaque Cast Vinyl Films Spec Guide. The Spec Guide stated that the product's outdoor durability was seven years and mentioned that the product could be

5

printed and used to make signs and decals. The Spec Guide stated that the cast vinyl was "engineered for use on irregular surfaces with rivets, corrugations, and where extended outdoor durability is required." The Spec Guide listed common uses and stated that the product "is used for recreational vehicles, fleet, marine, and automotive graphics and striping." (Doc. 41, ¶ 15; Doc. 47, ¶ 15; Doc. 42, Ex. 1.)

Ritrama also provided BGS with an Annual Contract Pricing document governing purchases between January 1, 2006, and May 31, 2006. (Doc. 42, ¶ 17, Ex. 2.) The document listed Ritrama's prices, standard upcharges, "F.O.B. Cleveland," and the terms for the contract. (Doc. 41, ¶ 17; Doc. 47, ¶ 17; Doc. 42, ¶ 17, Ex. 2.)

Additional negotiations regarding pricing occurred through emails between Wenzel in Illinois and Edwards in Wisconsin. (Doc. 42, ¶ 29, Ex. 9.) BGS consulted Ritrama to confirm that the cast vinyl was a "seven-year outdoor durable product." (Doc. 44, Ex. 2 at 23; Doc. 41, ¶ 66; Doc. 47, ¶ 66.) Ritrama admits that the 670 Series Opaque Cast Vinyl Films product is warranted for seven years. (Doc. 47, ¶ 59.)

BGS decided to purchase Ritrama's 670 series cast vinyl with 720 adhesive, which was same Ritrama product as the sample that Keystone had given to BGS. (Doc. 35, ¶ 17; Doc. 47, ¶ 17.) BGS negotiated pricing with Wenzel, who was located in Illinois. (Doc. 41, ¶ 18; Doc. 47, ¶ 18.) Edwards of BGS says his company decided to purchase Ritrama's 670 series cast vinyl based on the results of its initial adhesion testing, Ritrama's recommendations, and the Spec Guide received in December 2005. (Doc. 41, ¶ 68; Doc. 42, ¶ 28.)

6

BGS began purchasing 670 series cast vinyl with 720 or 700 adhesive from Ritrama in January 2006. (Doc. 41, ¶¶ 20, 21; Doc. 47, ¶ 20.) These purchases were made from January 2006 to July 2010. (Doc. 35, ¶ 18.) All of the cast vinyl products from Ritrama were shipped from Ritrama's Cleveland facility to BGS in Wisconsin; BGS processed the vinyl then shipped the processed decals to Keystone in Indiana. (Doc. 41, ¶¶ 20, 22; Doc. 47, ¶¶ 20.)

Ritrama possessed a "Converter Solution Guide," which stated that it "[t]ells you everything you need to know about placing an order: contact information, how orders are confirmed, minimums and custom converting charges. It also includes Terms and Conditions of Sale, General Product Warranties, and Return Policies." (Doc. 35, ¶ 28; Doc. 45, ¶ 28; Doc. 36 Ex. X at 3.) In a Converter Solution Guide dated October 2008 and produced by BGS during discovery (Doc. 36, ¶ 25), Ritrama's Conditions of Sale stated:

2. Except as provided in Condition 7 hereof, Seller makes no warranty of any kind, express or implied, except that the material sold hereunder shall be of merchantable quality, and the Buyer assumes all risk and liability for results obtained by the use of the material, whether used singly or in combination with other products.

3. No claims will be allowed after material has been treated, processed or altered in any manner. No claim of any kind, whether as to material delivered or for non-delivery of material, shall be greater in amount than the purchase price of the material in respect of which such damages are claimed; and failure to give notice of claim within two (2) weeks from the date of delivery shall constitute a waiver by Buyer of all claims in respect of such material. The remedy provided hereby shall be the exclusive and sole remedy of the Buyer; any right of the buyer to consequential damages is excluded.

. . . .

11. Upon request Seller will furnish such technical advice as it has available as to the use of its product by Buyer; but it is expressly understood, however, that all such technical advice is given gratis and

7

Seller assumes no obligation or liability for the advice given or results obtained, all such advice being given and accepted at Buyer's risk.

12. This instrument contains all the terms and conditions with respect to the sale and purchase of the material named herein and no modification or [sic] these terms and conditions shall be of any force or effect unless in writing and signed by the party claimed to be bound thereby.

(Doc. 35, ¶ 29; Doc. 45, ¶ 29; Doc. 36, Ex. X at 9-10.) Ritrama's Terms of Sale in the Converter Solution Guide provided, in relevant part:

These standard Terms & Conditions of Sale, together with information contained in Ritrama's written product order acknowledgement [sic] and/or invoice (and any additions or revisions mutually agreed to in writing by Ritrama and the Customer), shall constitute the entire agreement and understanding of Ritrama and the Customer with respect to the purchase and sale of Ritrama's products, superseding all prior oral or written understandings relating thereto. If Customer's order contains provisions inconsistent with the provisions hereof, these terms and conditions shall prevail. Customer's acceptance of delivery of or payment for any products provided hereunder shall constitute Customer's acceptance of all terms and conditions herein.

(Doc. 36, Ex. X at 7.) A December 2005 version of the Converter Solution Guide contained as a part of the Terms of Sale a disclaimer of warranties and limitation of liability:

Ritrama makes no warranties, express or implied, as to the goods and, in particular makes no warranties of merchantability or of fitness for any particular purpose, and Customer is solely responsible for determining proper application and use of the goods.

All information contained in this Solution Guide is either based on research and testing believed to be reliable or our experience, but does not constitute a warranty. The purchaser to determine suitability of the product for their purposes should test all material. It is the responsibility of the Customer to independently pretest this material for product performance, process capability, and end-use suitability.

(Doc. 35, ¶ 30; Doc. 45, ¶ 30; Doc. 37, Ex. 1 at 2; *see* Doc. 37, Ex. 1 at 1.)

8

BGS says it has reviewed its records and found nothing indicating that BGS received the 2005 or 2008 Converter Solution Guide, the Terms of Sale, or the Conditions of Sale prior to its first purchases of the cast vinyl from Ritrama. (Doc. 42, ¶ 36.) Copies of the 2005 Converter Solution Guide, which included the Terms of Sale and Conditions of Sale, and a sales acknowledgment, which contained the Conditions of Sale, were produced by BGS during discovery. (Doc. 36, ¶ 24, Ex. A at 147, Ex. W; Doc. 39, Ex. C.) Although BGS has those documents now, there is no direct evidence showing when those documents were received by BGS. (Doc. 42, ¶ 36.) Ritrama's President, Daryl Hanzal, states that Ritrama provided its customers, including BGS, with the Converter Solutions Guide, though he does not state when BGS received the Converter Solutions Guide. (Doc. 37, ¶ 5.)

Ritrama had a Cast Vinyl Product Warranty, which stated, in relevant part:

Ritrama warrants that its Cast Vinyl Series Film will provide seven years of outdoor durability for opaque films and five year exterior durability for Metallics, Gemstone Metallics, Translucents, Glass Etch and Pearlescents based on vertical exposure in temperate climates. Horizontal exposures and extreme climate exposures (e.g. desert, tropical) will reduce outdoor durability. Also exposure in polluted environments and near heat sources (e.g. engines) may reduce outdoor durability. Outdoor durability is defined as no significant cracking, checking, blistering, peeling, or excessive color change resulting in appreciable deterioration.

(Doc. 35, ¶ 22; Doc. 45, ¶ 22.) Ritrama's Cast Vinyl Product Warranty also stated that it did "not apply to failures caused by improper processing, improper application, changes in substrate (e.g. outgassing, rusting) or exposures to strong and abrasive chemicals." (Doc. 35, ¶ 24; Doc. 45, ¶ 24.) The warranty limited Ritrama's liability for products that did not meet the warranted performance, as determined by Ritrama's personnel, to "the prorated cost of the film based on the date of notification of the failure." (Doc. 35, ¶ 25;

9

Doc. 45, ¶ 25.)  The terms of Ritrama's Cast Vinyl Product Warranty were consistent from 2006 to 2010 when BGS was purchasing cast vinyl products from Ritrama.  (Doc. 37, ¶ 4.)

BGS reviewed its records and found no indication that BGS received the Cast Vinyl Product Warranty prior to its first purchases of cast vinyl from Ritrama.  (Doc. 42, ¶ 36.)  BGS's Chairman of the Board, Philip Holtje, does not know of any evidence that BGS received a copy of the Cast Vinyl Product Warranty prior to its initial purchase orders in January 2006.  (Doc. 43, ¶ 9.)  He does not recall receiving Ritrama's Cast Vinyl Product Warranty prior to the edge curl problems (described below).  On the other hand, Holtje recalls that Ritrama did not provide a copy of the Cast Vinyl Product Warranty until after the edge curl problems had become a major issue.  (Doc. 43, ¶ 9.)  However, Holtje acknowledges that a copy of the Cast Vinyl Product Warranty was faxed to BGS in late May 2008.  (Doc. 43, ¶ 8.; Doc. 36, Ex. Q.)

BGS now has the Cast Vinyl Product Warranty in its possession, but its president, Mark Edwards, says that nothing indicates when BGS received the document.  (Doc. 42, ¶ 36.)  Holtje, swore at a Fed. R. Civ. P. 30(b)(6) deposition, on behalf of BGS, that the Cast Vinyl Product Warranty applied to the products BGS purchased from Ritrama.  (Doc. 49, Ex. 1 at 34.)

Ritrama's Hanzal states that Ritrama provides the Cast Vinyl Product Warranty to purchasers of its cast vinyl products.  (Doc. 37, ¶ 4.)  However, he does not say whether and when BGS received the document.  (*See* Doc. 37, ¶ 4.)  The copy of the Cast Vinyl Product Warranty submitted by Ritrama has a fax date of May 2008.  (Doc. 36, Ex. Q.)

10

Ritrama provided the Cast Vinyl Product Warranty to customers who asked about warranty information. (Doc. 36, Ex. E at 71.)

When purchasing cast vinyl from Ritrama, BGS initiated each order by issuing a purchase order by fax or email. In response Ritrama, generally, sent order confirmations to BGS, by fax or email. The back sides of those documents were not included in those transmissions.[2] (Doc. 41, ¶ 47; Doc. 47, ¶ 57; Doc. 42, ¶ 23.) Ritrama also sometimes, on occasion, sent Sales Order Acknowledgments by mail.[3] (Doc. 41, ¶ 58; Doc. 47, ¶ 58; Doc. 42, ¶ 24.) The face of at least some of Ritrama's Sales Order Acknowledgments stated that the products were being shipped to BGS in Racine, Wisconsin. (Doc. 39, Ex. B.) The reverse of some Sales Order Acknowledgments contained the same Conditions of Sale as quoted above from the Converter Solution Guide with the exception that the time frame for a claim (in paragraph 3) was three months rather than two weeks. (*See* Doc. 39, ¶ 5, Ex. C.)

Some sales acknowledgments from Ritrama included a sheet of preprinted terms and conditions that were *Ritrama's* standard "Purchase Order Terms and Conditions." (Doc. 41, ¶ 58; Doc. 42, ¶ 24.) Ritrama acknowledges that on at least one occasion, Ritrama sent its own Purchase Order Terms and Conditions to BGS, but says that was by mistake. (Doc. 47, ¶ 58; *see* Doc. 36, Ex. U.) Ritrama's Purchase Order Terms and

---

[2]Ritrama denies that it did not send Sales Order Acknowledgments in response to each purchase order or that it did not send the back side (containing its Conditions of Sale) with each Sales Order Acknowledgment. (Doc. 39, ¶¶ 4–5, Exs. B & C.) According to Ritrama's Director of Finance, Mishelle Marsolais, "Ritrama sent a Sales Order Acknowledgment containing its Conditions of Sale in response to each purchase order Burlington Graphics Systems sent to Ritrama." (Doc. 39, ¶ 4.) But the facts are taken in BGS's favor.

[3]Ritrama says this happened in response to each BGS purchase order (Doc. 41, ¶ 58; Doc. 47, ¶ 58), but the facts are taken in BGS's favor.

11

Conditions state that they apply to "[t]his Purchase Order."  (Doc. 35, ¶ 51; Doc. 45, ¶ 51;

Doc. 36, Ex. U at 1-3.)  They add that

> [t]he Seller hereby agrees to hold the Buyer forever harmless from and against any and all liability for loss, cost, damages, fines, penalties, and expenses (including, but not limited to, reasonable attorney's fees) threatened, incurred or arising out of or by reason of: . . . the failure of such goods to comply with their specifications or with the express or implied warranties of the Seller; . . . the breach of the Seller of any of the terms of this Purchase contract.

(Doc. 36, Ex. U at 2, ¶ 14, 3, ¶ 14.)  The Ritrama Purchase Order Terms and Conditions

did not define "Seller" or "Buyer."  (*See* Doc. 36, Ex. U at 1-3.)

The cast vinyl products from Ritrama were the subject of hundreds of individual

purchase orders sent on BGS forms to Ritrama in Minneapolis.  (Doc. 35, ¶ 18; *see* Doc.

Doc. 39, Ex. B.)  BGS understood the nature and function of a purchase order.  (Doc. 35,

¶ 52.)  Edwards, BGS's president, has testified that a purchase order is submitted by a

buyer to a seller, and that BGS submitted its purchase order form to Ritrama when it

wanted to buy cast vinyl film from Ritrama.  (Doc. 35, ¶ 53.)  BGS produced in discovery

hundreds of purchase orders that it sent to Ritrama for the purchase of cast vinyl film.

(Doc. 35, ¶ 54.)  Each purchase order was on a BGS form and identified the product to be

purchased, the quantity, and the price.  (Doc. 35, ¶ 55; Doc. 45, ¶ 55.)

Mark Kozak, a Ritrama salesperson, sent annual pricing contracts to BGS.  (Doc.

41, ¶ 22.)  The initial contract was for purchases between January 2006 and the end of

May 2006.  (Doc. 41, ¶ 60.)  The next pricing contract covered a term of June 2006 through

May 2007.  (Doc. 41, ¶ 61; Doc. 42, ¶ 25, Ex. 8.)  Another Annual Contract Pricing

document was effective June 2007 through May 2008.  (Doc. 42, ¶ 50, Ex. 18.)

From 2006 through 2010, BGS purchased about $282,000 in product manufactured in Ritrama's Minnesota location and $6,071,000 in product manufactured in Ritrama's Ohio location. (*See* Doc. 39, Ex. A.) Ritrama was aware that the material sold to BGS would be printed and used in the RV market. (Doc. 41, ¶ 64.)

In late 2007 and early 2008, BGS discovered that several lots of Ritrama's cast vinyl suffered from ink-adhesion and brittleness problems. (Doc. 35, ¶ 33.) According to BGS, the problem was a compounding (or mixing) error at Ritrama. (Doc. 35, ¶ 34; Doc. 45, ¶ 34; Doc. 36, Ex. B at 56.) BGS discovered the ink-adhesion problem internally before any material was shipped to Keystone or other customers. (Doc. 34, ¶ 35.) The cause of the brittleness was not determined. (Doc. 36, Ex. B at 57.) Ritrama replaced all of the cast vinyl products that suffered from brittleness and ink-adhesion problems. (Doc. 35, ¶ 37.)

BGS bases its claims in this action mostly on a problem it calls "edge curl," which occurs when the edge of the graphic part of a decal peels or pulls away from the adhesive and the adhesive remains attached to the RV substrate. Edge curl is also referred to as "adhesive delamination." (Doc. 35, ¶ 38; Doc. 41, ¶ 24.) However, in addition, BGS claims that Ritrama's products exhibited problems with cracking and bubbling. (Doc. 35, ¶ 39; Doc. 45, ¶ 39.) BGS acknowledges that the vast majority of alleged product failures for which it seeks damages occurred on decals applied to the front end caps of RVs, some of which were more horizontal than vertical surfaces. (Doc. 35, ¶ 23; Doc. 45, ¶ 23.)

Keystone first reported edge-curl failures to BGS on December 13, 2007. (Doc. 35, ¶ 40; Doc. 41, ¶ 23.) The decals adhered to the RVs for a short time but failed about eighteen to twenty-four months after application. (Doc. 41, ¶ 65; Doc. 47, ¶ 65.) Additional

13

product failure complaints by Keystone regarding Ritrama's cast vinyl followed, including complaints about peeling and bubbling.  (Doc. 41, ¶ 25; Doc. 47, ¶ 25.)

As additional failures surfaced, Keystone notified BGS that it expected all decal failures to be covered under BGS's warranty to Keystone.  (Doc. 35, ¶ 41.)  Pursuant to Keystone's demands, BGS's warranty covered all failures that occurred within one year from the date of sale to an end customer.  (Doc. 41, ¶ 26.)  Keystone's purchasing policy required BGS to pay the cost of product replacement, labor to remove the faulty decal and to apply a new graphic, shipping, and any dealer mark-up.  (Doc. 35, ¶ 42.)  The claims BGS then submitted to Ritrama consisted of all costs BGS paid to Keystone pursuant to Keystone's purchasing policy, though Ritrama is not a party and has never agreed to Keystone's purchasing policy.  (Doc. 35, ¶ 43; Doc. 45, ¶ 43.)

BGS, Ritrama, Keystone, and the ink supplier investigated the cause of the decal failures.[4]  (Doc. 41, ¶ 27; Doc. 47, ¶ 27.)  While doing so, they discussed possible solutions to BGS's warranty claims.  (Doc. 35, ¶ 44.)  In approximately June or July of 2008, BGS began using Ritrama cast vinyl with a 530 adhesive instead of the 700 or 720 adhesive in an attempt to prevent further cast vinyl failures.  (Doc. 41, ¶ 35; Doc. 47, ¶ 35.)

On September 9, 2008, BGS submitted to Ritrama a first set of Keystone claims, totaling about $53,000.  (Doc. 41, ¶ 36.)  Initially, Ritrama did not expressly point to the Terms of Sale, Conditions of Sale, or the Cast Vinyl Product Warranty.  (Doc. 42, ¶ 35.) In September and early October 2008, Ritrama's National Accounts Manager, Patrick

---

[4]Whether Ritrama's cast vinyl products were defective is disputed.  (*Compare, e.g.*, Doc. 47, ¶ 28 ("Ritrama concluded that the decal problems arose from converting and application problems and not due to any product defect.") *with* Doc. 41, ¶ 31 ("The investigation and testing in 2008 by BGS, Ritrama, Keystone and Nazdar narrowed down the problem to a failure of Ritrama's adhesive on the vinyl.").)  The cause of the edge curl is not material for the present motion.

14

McCormack, asked BGS for its expectation regarding Ritrama's contribution to the claim and whether BGS had a certain percentage split in mind. (Doc. 41, ¶ 39; Doc. 47, ¶ 39; Doc. 42, Ex. 14.) McCormack wrote that Ritrama was "interested in establishing a resolution here as well as some closure to the entire case." (Doc. 42, Ex. 14 at 1.) Thereafter, Ritrama's Bill Stalker wrote BGS an October 10, 2008 letter stating:

> Ritrama's normal credit policy covers the value of the product supplied. This credit policy is in place because the customer has a responsibility to determine if the material has suitable performance for their application before adding value. It is difficult for Ritrama to shoulder a claim that is many times the material cost.

(Doc. 36 Ex. J.) Stalker did not expressly point to the Terms of Sale or Conditions of Sale or Cast Vinyl Product Warranty. (*See* Doc. 36, Ex. J.) He noted that Ritrama valued its relationship with BGS and that BGS was receiving claims from Keystone that included "material costs, removal costs, cleaning cost, application cost, etc." (Doc. 36, Ex. J.) Stalker offered a "reasonable settlement proposal of 50%" of the claims then pending from Keystone. (Doc. 36, Ex. J.)

BGS agreed to a fifty-fifty split. (Doc. 41, ¶ 42.) By February 2009, as additional claims were submitted by Keystone to BGS, and then by BGS to Ritrama, the claims had reached a total of about $118,000. (Doc. 41, ¶ 37.) Pursuant to the parties' agreement, in February 2009 Ritrama paid BGS $60,000, which covered just over half of the $118,000 in outstanding claims at that time. (Doc. 41, ¶ 41.)

According to BGS, it agreed to the fifty-fifty split because it had not determined the root cause of the failures and it thought it could have been contributing to the issue. (Doc. 41, ¶ 42; Doc. 47, ¶ 42.) However, BGS later came to believe that the failure was due to

15

Ritrama's defective product and requested that Ritrama pay a substantial cash portion of claims with the balance as a structured monthly material credit. (Doc. 41, ¶ 42; Doc. 47, ¶ 42.)

Ritrama and BGS met multiple times and conducted numerous telephone calls to discuss the Keystone warranty claims. (Doc. 41, ¶ 71; Doc. 42, ¶ 42.) Edwards and Jeff Knutson from BGS provided Ritrama's Daryl Hanzal with the outstanding claims of which BGS was aware. (Doc. 41, ¶ 43; Doc. 47, ¶ 43.) At those meetings, according to Edwards, Hanzal

> urged BGS to avoid a massive recall and instead manage the claims as they came in from Keystone. Hanzal did this by repeatedly promising to pay BGS for Keystone's clams. . . .
>
> . . . . During our meetings and calls, Hanzal told me and others from BGS that it was important for Ritrama's reputation and for BGS's own reputation that BGS pay the Keystone clams, avoid a recall, and told us that if BGS would keep paying Keystone's claims, Ritrama would take care of the claims. I understood this to mean that Ritrama would honor 100% of the claims BGS paid to Keystone.

(Doc. 42, ¶¶ 43-44.) BGS's Holtje, too, recounts Hanzal using those words.[5] (Doc. 43, pars 11–12.) In reliance on Hanzal's words, BGS decided to continue paying Keystone's claims as they came in, purchase additional product from Ritrama, and remain a Ritrama customer. (Doc. 41, ¶ 46; Doc. 42, ¶ 45; Doc. 43, ¶ 13.)

At some point, Ritrama's National Accounts Manager, Scott Ellar, communicated to BGS that Ritrama was "working on it" and would come up with a resolution. (Doc. 47,

---

[5]Ritrama denies that Hanzal made any statements or promises in response to a threat by BGS of a product recall. (Doc. 47, ¶ 73.) Hanzal has testified that he did not say the claims "would be taken care of" and that he told BGS only something like "we'd work with them." (Doc. 47, ¶ 43; Doc. 41, ¶ 44; Doc. 44, Ex. 4 at 64.) The facts are taken in BGS's favor.

¶ 45; Doc. 44, Ex. 5 at 41–42, 48.) However, Knutson acknowledges that BGS and Ritrama never agreed to any terms or discussed any dollar figures relating to Ellar's comment. (Doc. 47, ¶ 45; Doc. 44, Ex. 5 48.) Knutson states that Hanzal and others at Ritrama led BGS to believe that Ritrama would resolve the whole of the outstanding claims, not just a portion of them, via cash and material credit. (Doc. 41, ¶ 45; Doc. 44, Ex. 5 at 41–42, 48.)

In March 2010, Mishelle Marsolais, Ritrama's Director of Finance, authored an interoffice memo stating:

> Regarding the status of the claim for Burlington Graphics on the material applied to the front-end cap, Ritrama previously agreed to honor 50% of the claim amount. Since the filing of the original claim, the scope has been expanded by Burlington to include materials related to other graphics applied to areas other than the front-end cap. Ritrama has not approved any liability in relation to the expanded scope of the claim at this time.
>
> . . . .
>
> While Ritrama believes that our product is not the cause of this claim, we made the decision to support Burlington Graphics and have already issued a $60,000 credit towards the original claim as an accommodation. Per our *Conditions of Sale*, Ritrama reserves the right to issue replacement material for any claims versus issuing a credit memo. It is our intent that the settlement of this claim with Burlington Graphics will involve issuing credit memos in the amounts to offset outstanding and future sales. There will be no exchange of cash for the transaction. This will provide Ritrama the opportunity to offset future profitability with the impact of the cost of the claim and should not have any financial impact on Burlington Graphics.
>
> . . . .
>
> There are other factors to be applied in the outstanding and future claims regarding Ritrama's warranty parameters.

(Doc. 36, Ex. R at 1–2.)

17

Hanzal has testified in his deposition that Ritrama worked with other customers to resolve claims and sometimes entered a modified claim resolution agreement—it "didn't have anything set in stone." (Doc. 41, ¶ 50; Doc. 47, ¶ 50; Doc. 44, Ex. 4 at 115, 124.) In 2011, Ritrama paid customer Sharpline about $8,000, where material costs were approximately $2,000 and the majority was labor. (Doc. 41, ¶ 51; Doc. 47, ¶ 51; Doc. 44, Ex. 4 at 124–25.) Ritrama and Graphix had a modified claims structure. (Doc. 41, ¶ 52; Doc. 47, ¶ 52; Doc. 44, Ex. 4 at 115–16.) With respect to an apparently separate July 2007 request by BGS for payment of labor and ink costs, Ritrama's Stalker responded that "[w]ith labor we normally propose 50%" and that Ritrama would pay for the ink. (Doc. 42, Ex. 7 at 1.)

In July 2010, Ritrama's Ellar wrote to BGS offering an additional $175,000 "for final and complete settlement" to bring the matter to "closure." (Doc. 36, Ex. N.) In August 2010, Ellar wrote to BGS:

> While Ritrama believes that our product is not the cause of this claim, we made a concerted effort to support Burlington Graphics and issued a $60,000.00 credit before the full extent of the complaint was known. At that time, we fully expected to continue to supply the replacement material as well. Per our *Conditions of Sale,* Ritrama reserves the right to issue replacement material for any claims versus issuing a credit memo or other forms of payment.
>
> . . . .
>
> We will continue to seek a mutually acceptable resolution to finalize this claim. We previously offered $175,000.00 for settlement and look forward to your feedback and closure in the near future.

(Doc. 36, Ex. 15.)

BGS rejected the $175,000 offer. Its email rejecting the offer stated: "[b]ased on the last twelve months of communication you have always assured us that those costs

18

would be covered." (Doc. 41, ¶ 56; Doc. 47, ¶ 56; Doc. 42, Ex. 17 at 1.)  As of September 2010, the totals of the Keystone claims paid by BGS were $447,939 for 2009 and $554,187 for 2010.  (Doc. 41, ¶ 56; Doc. 47, ¶ 56.)

BGS claims damages in this lawsuit in excess of $6,259,829 plus additional accruing interest.  (Doc. 35, ¶ 47.)  BGS's total claimed damages consist of $1,469,391 paid to Keystone for warranty claims; $189,688 for decals supplied to dealers at Keystone's request but which were not the subject of specific warranty claims; $4,046,000 in lost profits; and $554,750 in statutory interest on all claimed damages.  (Doc. 35, ¶ 48; Doc. 41, ¶ 77.)  BGS asserts that it purchased a total of $4,883,411.17 in defective vinyl. (Doc. 41, ¶ 76.[6])

No one document contains all of the terms that would apply to BGS's cast vinyl purchase.  (*See* Doc. 41, ¶ 78; Doc. 47, ¶ 78.)

Ritrama admits that it provided a seven-year warranty for its cast vinyl products "as governed by the terms of its Cast Vinyl Product Warranty."  (Doc. 47, ¶ 27.)

The court has subject matter jurisdiction under 28 U.S.C. § 1332 because the lawsuit is between citizens of different states and the amount in controversy exceeds $75,000.

CHOICE OF LAW

BGS contends that Wisconsin law applies to this case, while Ritrama contends that Minnesota law applies.  Nevertheless, each argues that it prevails on the present motion under either state's law.  This court will not analyze the application of the laws of both

---

[6]Ritrama disputes whether the vinyl was defective.  (Doc. 47, ¶ 76.)

19

states to the facts in this case. The better course is to determine now which state's law applies.

Because this court sits in Wisconsin and the case involves state-law claims, the court must apply Wisconsin choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Ruiz v. Blentech Corp.*, 89 F.3d 320, 324 n.1 (7th Cir. 1996). Under those rules, the law of the forum presumptively applies unless there are nonforum contacts that are of greater significance. *Wilcox v. Wilcox*, 26 Wis.2d 617, 634, 133 N.W.2d 408 (1965).

"In contractual disputes, Wisconsin courts apply the 'grouping of contacts' rule, pursuant to which contract rights must be 'determined by the law of the [jurisdiction] with which the contract has its most significant relationship.'" *State Farm Mut. Auto Ins. Co. v. Gillette*, 2002 WI 31, ¶ 26, 251 Wis. 2d 561, ¶ 26, 641 N.W.2d 662, ¶ 26 (footnotes omitted) (alteration in original). The court evaluates five factors to determine which state has the most significant contacts with the case: (1) the place of contracting; (2) the place of contract negotiations; (3) the place of contract performance; (4) the place the contract subject matter is situated; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Haines v. Mid-Century Ins. Co.*, 47 Wis. 2d 442, 446, 177 N.W.2d 328 (1970); *NCR Corp. v. Transp. Ins. Co.*, 2012 WI App 108, ¶ 13, 344 Wis. 2d 494, ¶ 13, 823 N.W.2d 532, ¶ 13. The contacts are not simply counted; they are assessed qualitatively and by determining which are most significant. *Haines*, 47 Wis. 2d at 447. If one state's contacts are clearly more significant, the court can terminate analysis after considering the above factors. *NCR Corp.*, 2012 WI App 108, ¶ 13.

20

However, if consideration of the above factors does not identify which state's law should apply, the court also weighs the "choice-influencing factors" of (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Id.*, ¶ 14; *see Drinkwater v. Am. Family Mut. Ins. Co.*, 2006 WI 56, ¶ 40, 290 Wis. 2d 642, ¶ 40, 714 N.W.2d 568, ¶ 40.

The court finds that the contacts regarding BGS's purchases from Ritrama's Minneapolis location in 1997 are immaterial for grouping-of-contacts purposes, as they concern purchases of different products. This case is about the 670 series cast vinyl purchases and the relationship between the parties relating to that product.

As for the contractual relationship for the 670-series cast vinyl, the grouping of contacts rule supports the finding that Wisconsin law applies. BGS reached out from Wisconsin to Ritrama's agent, Wenzel, in Illinois to negotiate its purchases. Wenzel then traveled to Wisconsin for negotiations. Thereafter, correspondence occurred between BGS in Wisconsin as well as Wenzel in Illinois or Ritrama employees in Ohio. The Spec Guide, for instance, was faxed to Wisconsin by Ritrama from its Ohio facility. The contract was executed through purchase orders sent from Wisconsin to Minnesota and Sales Order Acknowledgments sent from Ohio to Wisconsin.[7]

The bulk of the products shipped to BGS from January 2006 (when the cast vinyl purchases began) onward were manufactured in Ohio and received by BGS in Wisconsin—over $6,000,000 in product from Ohio versus less than $300,000 in product

---

[7]The Sales Order Acknowledgments use a Ritrama form with its Ohio address at the top. (Doc. 39, Ex. B.)

from Minnesota from 2006 to 2010. Twenty times more product was shipped from Ohio than from Minnesota. Although some products may have been manufactured and shipped from Minnesota, that number was minor in comparison, and all of the products headed to Wisconsin for processing by BGS. It is unclear where payments from BGS were sent, but facts before the court strongly suggest that all payments came from Wisconsin. Thus, BGS performed in Wisconsin while Ritrama performed predominantly in Ohio and only somewhat in Minnesota.

As for the location of the subject matter, Ritrama's Annual Contract Pricing sheets stated that all shipments were F.O.B. Cleveland. *See Novelly Oil Co. v. Mathy Constr. Co.,* 147 Wis. 2d 613, 626, 433 N.W.2d 628 (App 1988) ("F.O.B. refers to the place where the buyer is going to take possession of the product."). Hence, it appears that title to the goods passed to BGS in Ohio. The products then were shipped to Wisconsin where BGS printed and processed decals on the cast vinyl products. Thereafter, the decals were shipped to Keystone in Indiana and then distributed (wherever the RVs ended up after sale), perhaps nationwide. Therefore, it further appears that all products passed through Wisconsin on their way elsewhere and even if some decals ended up on RVs in Minnesota, there is no evidence suggesting that those number of decals were substantial as compared with the decals on RVs in other states. Finally, BGS is located in Wisconsin while Ritrama's business is divided between Minnesota and Ohio, and much of the dealings of BGS with Ritrama regarding the cast vinyl at the heart of this case involves Ritrama's Ohio office.

Wisconsin's contacts with the contract and transactions at issue outweigh those of other states. Minnesota's law certainly does not apply. Illinois's and Ohio's contacts are

22

arguably equal or more substantial than Minnesota's.  But none outstrip contacts involving Wisconsin, the forum state.  And because the contacts with Wisconsin are clearly more significant, the court need not consider the additional choice-influencing factors.

DISCUSSION

A.    Limitation of Remedy and Exclusion of Consequential Damages

Ritrama has moved for partial summary judgment based on its limitation of warranties and exclusion of consequential damages in its Cast Vinyl Product Warranty, Terms of Sale, and Conditions of Sale.

1.    The Documents Limit Damages and Exclude Consequential Damages—if they Apply

Assuming for argument's sake that the Cast Vinyl Product Warranty, Terms of Sale, and Conditions of Sale (whether from the Converter Solution Guide or Sales Order Acknowledgments) apply, the court agrees with Ritrama that those documents, read together, limit damages to the purchase price or replacement of the material and exclude consequential damages.

Paragraph 3 of the Conditions of Sale is clear:  "No claim of any kind . . . shall be greater in amount than the purchase price of the material in respect of which such damages are claimed. . . . The remedy provided hereby shall be the exclusive and sole remedy of the Buyer; any right of the buyer to consequential damages is excluded."  The terms of the Cast Vinyl Product Warranty, consistent from 2006 to 2010, limited Ritrama's liability for products that did not meet the warranted performance for seven years to "the prorated cost of the film based on the date of notification of the failure."  Read together,

23

the documents are consistent—damages cannot exceed the purchase price and are reduced as time goes on.

BGS points out conflicts between the documents. The Cast Vinyl Product Warranty says it lasts seven years, while the Conditions of Sale state that a claim must be made within two weeks (Converter Solution Guide) or three months (Sales Order Acknowledgments). However, Ritrama concedes that its warranty lasts seven years, and it has not raised any argument in its motion or briefs that BGS failed to make its claims timely. Further, regardless of whether the seven-year time frame is at odds with the two-week or three-month time frame language, the exclusions of consequential damages and the limitation to a maximum of the purchase price *are* consistent.

Ritrama does not contend that paragraph 3 of the Conditions of Sale ("No claims will be allowed after material has been treated, processed or altered in any manner.") bars recovery because BGS cut and printed the vinyl. Thus, the court need not address that language or the application of *Trinkle v. Schumacher Co.*, 100 Wis. 2d 13, 301 N.W.2d 255 (Ct. App. 1980).

In sum, if the provisions are part of the parties' agreement and are valid under Wisconsin law, they bar consequential damages and anything in excess of the purchase price of the products pro rated over time.

2.  Whether the Limitation and Exclusion are Valid under Wisconsin Law Involves a Question of Fact

Pursuant to Wisconsin's version of the Uniform Commercial Code ("UCC"), a seller of goods may limit contractual liability in two ways: (1) disclaimer or limitation of warranties under Wis. Stat. § 402.316 or (2) limitation of remedies under Wis. Stat. § 402.719.

24

*Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 414, 265 N.W.2d 513 (1978). A disclaimer of warranties limits liability by reducing the number of circumstances in which the seller will be in breach, i.e., it precludes the existence of a cause of action. A limitation of remedies restricts the damages available once a breach is established. *Id.* The methods are closely related and may have the same effect. *Id.* Here, the court first addresses the limitation of remedies under § 402.719.

A goods contract "may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under [the UCC], as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods." Wis. Stat. § 402.719(a). However, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose," the remedies in the UCC remain available. § 402.719(b)(2). Although consequential damages may be limited or excluded unless unconscionable, § 402.719(b)(3), if a limitation on remedies fails of its essential purpose, any consequential damages exclusion fails with it, *Fid. & Dep. Co. v. Krebs Eng'rs*, 859 F.2d 501, 504–05 (7th Cir. 1988).

Although § 402.719 gives parties latitude to fashion their remedies, "the UCC disfavors limitations on remedies and provides for their deletion where they would effectively deprive a party of reasonable protection against breach." *Murray*, 83 Wis. 2d at 418. The underlying philosophy of the UCC is "that there be at least a fair quantum of remedy for breach of obligations." *Phillips Petroleum Co. v. Bucyrus-Erie Co.*, 131 Wis. 2d 21, 40, 388 N.W.2d 584 (1986).

25

"The essential purpose of any damage award is to make the injured party whole."
*Id.* at 39. "The purpose of an exclusive remedy of repair or replacement, from the buyer's
standpoint, is to give him goods which conform to the contract. . . . ." *Murray*, 83 Wis. 2d
at 420. Generally, a limited remedy fails of its essential purpose when "the remedy is
ineffectual or when the seller fails to live up to the remedy's provisions, either of which
deprives the buyer of the benefit of the bargain." *Waukesha Foundry, Inc. v. Indus. Eng'g,
Inc.*, 91 F.3d 1002, 1010 (7th Cir. 1996). "It is not enough to trigger [§ 402.719(b)(2)] that
[the seller] may have delivered nonconforming goods; [the buyer] must demonstrate that
this breach, whether isolated or otherwise, caused it harm that the contractual remedy was
incapable of curing." *Id.*

In *Murray*, the court found that for the plaintiffs' motor home to conform to the
contract it had to be substantially free of defects within a reasonable time after the defects
were discovered. 83 Wis. 2d at 420. Because the seller failed to repair the defects after
a reasonable time to do so, the limited remedy failed and the buyer was permitted to
invoke any of his UCC remedies, including revocation of acceptance. *Id.* at 421, 425. The
seller failed to live up to the remedy's provisions.

In *Phillips Petroleum*, the parties' contract specifically called for use of a particular
grade of steel for adapters to be used on drilling rigs in the cold and wet conditions of the
North Sea. Phillips paid extra for the use of the expressly specified steel, and Bucyrus
warranted that the adapters would be in accord with the steel specifications. 131 Wis. 2d
at 34–35. The warranty was breached because Bucyrus used a nonspecified grade of
steel, which failed in the North Sea conditions. *See id.* at 36. One crane broke and fell into

26

the sea. As a result, use of all cranes on thirteen drilling rigs was suspended until the adapters were replaced. *Id.* at 24–25.

The Supreme Court of Wisconsin found that a limitation of liability to replacement of parts F.O.B. Erie, Pennsylvania, failed of its essential purpose because it "only minusculely compensated the purchaser." *Id.* at 39. Although such a limitation of damage could be appropriate in many cases to make the buyer whole, that was not true when the parts were needed in the North Sea, thousands of miles away from Erie. *See id.* at 38–39. Further, although the adapter failed on only one crane, the domino effect was that none of the cranes could be used until they were repaired and certified—a "total failure of Phillips' ability to use expensive and complex equipment for a protracted period of time." *Id.* at 38. The court found that the remedy of a replacement part in Erie provided damages that were "unconscionably low" in the circumstances. *Id.* at 39. Thus, the remedy failed and Phillips could pursue any remedy provided in the UCC. *Id.* at 38–40. The remedy was ineffectual.

On the other hand, in *Waukesha Foundry*, the buyers failed to show that the limited remedy of repair or replacement was ineffectual for breach of the obligation to provide nondefective steel castings. The buyer was not deprived of the benefit of its bargain. *See* 91 F.3d at 1010. To the contrary, the facts showed that the buyer availed itself of those remedies, obtaining replacement steel castings or reimbursement for a portion of their value if the buyer repaired the castings itself. *See id.* at 1004. The contractual remedy adequately cured or compensated for the harm.

27

Here, Ritrama's warranty provides for replacement or reimbursement for any defective product, up to the value of the product prorated over time. BGS would not be left with a defective product like Murray's motor home. It would receive replacement product or be reimbursed for the value of the defective product prorated over time. But, whether that remedy is ineffectual in the circumstances is a question of fact for trial. A reasonable jury could find that at the point when the decals failed, months after application to the RVs, mere replacement or compensation for the value of the vinyl would not make BGS whole. Simply mailing the plain cast vinyl to RV owners for replacement could be seen as insufficient. BGS had to cut and print new decals with the vinyl. Further, the record indicates that adhesive remained on the vehicles upon edge curl. Taking the facts in BGS's favor, there were costs and effort expended for removal of the defective decals and applying the new decals. Presumably, RVs were sold to buyers in various states and driven far from Keystone's or BGS's manufacturing facilities. If so, additional costs may have been incurred to recover and replace the defective decals.[8] Whether these additional damages are so substantial that the limited remedy of replacement or payment of the prorated value of the vinyl is unconscionably low as in *Phillips Petroleum* is a question for the jury.[9]

---

[8]This situation differs from that relating to the ink-adhesion problem in 2007, when Ritrama replaced the vinyl film before any decals were applied to RVs.

[9]That BGS provided Keystone with a greater warranty than that provided by Ritrama is not material for the present discussion. That BGS voluntarily gave a greater warranty to obtain and keep Keystone's business has no bearing on whether the limited warranty given by Ritrama is valid.

28

3.     And Questions of Fact Exist about Whether the Warranties and Limitations
       Apply at All

The above discussion assumes that the limitations of remedy and exclusion of consequential damages were part of the parties' agreement.  But questions of fact exist regarding whether they applied to any or all of BGS's purchases of Ritrama cast vinyl.  A reasonable jury could find that BGS did not know about the limited remedy and exclusion of consequential damages (or any specifics of Ritrama's warranties other than the seven-year period from the Spec Guide) prior to or as part of its first order.  At the time of its first purchase order, BGS had the Spec Guide and the first Annual Pricing sheet.  Construing the evidence in BGS's favor, suggests that BGS did not receive the Converter Solution Guide or the Cast Vinyl Product Warranty or any sheet showing the Terms of Sale or Conditions of Sale prior to or as part of its first purchase.  BGS representatives do not recall receiving those documents before orders began, and one copy of the Converter Solution Guide from BGS's files is dated October 2008.  Although a portion of the December 2005 Converter Solution Guide was in BGS's files, it is unclear when it was received.  BGS indicates that only the fronts of the majority of the Sales Order Acknowledgments were faxed or e-mailed; the Conditions of Sale on the back were not included.  Although BGS admits that at times Sales Order Acknowledgments were mailed to BGS by Ritrama, a reasonable jury would have difficulty determining on the present record when that first occurred and whether by receipt of those back-side Conditions of Sale in the midst of hundreds of Sales Order Acknowledgments BGS agreed to those conditions.

29

Further, even if the written exclusions or limitations applied at some point, questions of fact exist as to whether those exclusions or limitations were modified or waived by the parties' course of dealing or subsequent agreement or waivers. Under the UCC, the course of performance may be considered in determining the meaning of an agreement, Wis. Stat. § 402.208, and the parties may modify the contract without further consideration and may waive terms of the contract, Wis. Stat. § 402.209.

In *Waukesha Foundry*, the buyer would order by telephone a particular number of steel castings then fax a confirming purchase order. The parties disagreed whether the seller sent an acknowledgment form confirming the order. 91 F.3d at 1003. After manufacturing the castings, the seller shipped the order to the buyer, enclosing with each order a packing slip, then followed each shipment with an invoice. Each packing slip and invoice had terms and conditions of sale, including a limitation of remedy to repair, replacement, or equitable refund if the castings were defective in material and workmanship, a disclaimer of any warranty of merchantability, warranty of fitness for use, or other express or implied warranty, and a disclaimer of any special or consequential damages. *Id.* at 1004. The buyer placed sixty orders over four years, and the seller sent 234 packing slips and invoices. *Id.* Moreover, the buyer availed itself of the remedy provisions on several occasions by getting reimbursed or a replacement for a defective casting. *Id.* The Seventh Circuit found that the terms and conditions in the packing slips and invoices became part of each contract of sale under UCC § 2-207 and were enforceable. *Id.* at 1008. The undisputed evidence demonstrated that through the course of dealing the buyer consented to the terms and conditions in the packing slips and

30

invoices and even availed itself of the remedies set forth in those terms and conditions. *Id.* at 1009.

Here, even if the Cast Vinyl Product Warranty, Terms of Sale, and Conditions of Sale applied to some or all of the transactions, questions of fact exist as to whether the parties modified the terms regarding exclusions or limitations through the course of performance and whether Ritrama waived those exclusions or limitations through its words and actions.[10]  Viewing the evidence before the court in BGS's favor, Ritrama's Hanzal promised to take care of the Keystone claims that were made upon BGS and induced BGS to not recall its products and to continue purchasing from Ritrama.  Hanzal's words were such that BGS's Edwards and Holtje believed Ritrama would reimburse BGS for 100% of the Keystone claims.  However, it is unclear whether Hanzal's words related only to the negotiations resulting in the $60,000 payment or to subsequent claims as well.

Not until late in the parties' negotiations over the Keystone claims did Ritrama expressly point to its warranty limitations.  And Ritrama did not always stick to its guns regarding its limitation on remedies.  Twice, Ritrama approved modified claims by BGS. In addressing the separate ink-adhesion defect, Ritrama covered the ink and some of the labor charges, then later paid $60,000 on the $118,000 claim.  Ritrama's Stalker also told BGS that Ritrama normally proposed reimbursement of fifty percent of labor charges.  In consideration of this evidence, a reasonable jury could find that Ritrama represented that more than replacement value would be paid to BGS and induced BGS not to issue a recall and to continue buying Ritrama's product.

---

[10]Even if the terms of the parties' agreement required that a modification be in writing, Ritrama's words and actions could still operate as a waiver.  Wis. Stat. § 402.209(4).

Therefore, the motion for partial summary judgment must be denied regarding the limitation of remedies and exclusion of consequential damages.

B.     Implied Warranties

In count II of the Complaint, BGS claims that Ritrama breached its implied warranties of merchantability and that the vinyl would be suitable for BGS's needs and uses, i.e., that the vinyl was fit for the purpose for which it was required.  (*See* Doc. 1, ¶¶ 59–62.)

The UCC provides that a goods contract includes certain implied warranties unless such warranties are expressly excluded or modified.  *Estate of Kriefall v. Sizzler USA Franchise, Inc.*, 2012 WI 70, ¶ 22, 342 Wis. 2d 29, ¶ 22, 816 N.W.2d 853, ¶ 22; *see* Wis. Stat. § 402.316.  Implied warranties include the implied warranty of merchantability (if the seller is a merchant regarding the type of goods sold) and the implied warranty that the goods will be fit for the purpose for which the goods are required.  *Estate of Kriefall*, 2012 WI 70, ¶ 23; *see* Wis. Stat. §§ 402.314, 402.315.

Section 402.316 permits a seller to limit or exclude implied and express warranties. *Murray*, 83 Wis. 2d at 414–15.   However, any waiver of the implied warranty of merchantability must mention "merchantability" and must be conspicuous.   Wis. Stat. § 402.316(2).  To exclude or modify any implied warranty of fitness "the exclusion must be by a writing and conspicuous."  *Id.*  "Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the fact hereof.'"   *Id.*   A limitation of implied warranties "must not be

32

unconscionable in light of the circumstances at the time the contract was made." *Murray*, 83 Wis. 2d at 415.

Language constituting an express warranty overrides language in the same contract disclaiming all warranties. *See id.* at 416–17. In *Murray*, for instance, the court found that language in the contract warranting that the motor home was free of defects in material and workmanship at the time of its delivery conflicted with a preceding disclaimer of all warranties. *Id.* at 417. Because of the conflict, the language of express warranty controlled. *Id.* However, words or conduct creating an express warranty and words or conduct negating or limiting warranty should be construed as consistent with each other if reasonable. Wis. Stat. § 402.316(1).

An implied warranty can be excluded or modified by course of dealing or course of performance as well. § 402.316(3)(d).

1. Ritrama's Express Warranty Can Coexist with the Implied Warranty of Merchantability

Ritrama submits that because it gave an express warranty of merchantability, the claim for breach of an implied warranty of merchantability must be dismissed. Ritrama acknowledges that in paragraph 2 of the Conditions of Sale it created an express warranty of merchantability under Wisconsin law, Wis. Stat. § 402.313. (Doc. 34 at 18.) In paragraph 2 Ritrama stated (emphasis added) that "Seller makes no warranty of any kind, express or implied, *except that the material sold hereunder shall be of merchantable quality*."[11]

---

[11]Ritrama does not, nor could it reasonably, argue that the disclaimer of its express warranty of merchantability in the Terms of Sale in the Converter Solution Guide ("Ritrama makes no warranties, express or implied, as to the goods and, in particular makes no warranties of merchantability or of fitness for any

33

Express warranties displace inconsistent implied warranties other than the implied warranty of fitness of particular purpose. Wis. Stat. § 402.317(3). However, warranties, "whether express or implied, shall be construed as consistent with each other and as cumulative" unless such a construction is unreasonable. § 402.317. Ritrama does not persuade the court that the express warranty of merchantability in the pertinent sale documents conflicts with the implied warranty of merchantability. Thus, it appears that the express and implied warranty can be consistent and cumulative.

The disclaimer of all warranties except those of merchantability in paragraph 2 of the Conditions of Sale can be read to keep the implied warranty of merchantability alive in addition to an express warranty of merchantability. And, as discussed above, questions of fact exist about whether the express warranty was part of the parties' agreement at all. Therefore, the motion for partial summary judgment must be denied on this point.

2.      Implied Warranty of Fitness for a Particular Purpose

An implied warranty of fitness for a particular purpose arises "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Wis. Stat. § 402.315. A showing that the buyer relied on the seller to select the correct product for the buyer is a requisite for recovery. *Wis. Elec. Power Co. v. Zallea Bros., Inc.*, 443 F. Supp. 946, 951 (E.D. Wis. 1978), *aff'd*, 606 F.2d 697 (7th Cir. 1979); *see Ewers v. Eisenzopf*, 88 Wis. 2d 482, 491, 276 N.W.2d 802 (1979). When a

---

particular purpose . . . .") is valid. *Murray* directs that the written express warranty of merchantability in the Conditions of Sale overrides the disclaimer of such a warranty in the Terms of Sale.

34

buyer selects its own goods, it cannot recover upon the implied warranty of fitness for a particular purpose." *Ewers*, 88 Wis. 2d at 491.

Here, the evidence presented by BGS indicates that the first element of the claim is satisfied. Edwards told Ritrama's agents or employees that the cast vinyl product he desired would be used for RVs. Ritrama's Spec Guide indicated that one use of the product was recreational-vehicle graphics and striping, and BGS told Ritrama it obtained the sample from Keystone, an RV manufacturer, and Graphix.

The undisputed evidence shows that BGS did *not* rely on Ritrama for selection of the cast vinyl. BGS sought out Ritrama and provided a sample cast vinyl product obtained from Keystone. BGS told Ritrama that it wanted the same product and Ritrama provided two samples for BGS to assess and compare with the sample from Keystone. No evidence suggests that BGS asked Ritrama which sample or which cast vinyl series thought was better for BGS's use. Edwards says BGS decided to purchase based in part on Ritrama's recommendations. (*See* Doc. 41, ¶ 68; Doc. 42, ¶ 28.) But no evidences indicates that Ritrama ever made any such recommendation. Instead, the evidence shows that BGS chose the 670-series product based on the Spec Guide, its brief testing of the product, the seven-year durability representation, and Ritrama's reputation. No evidence now before the court supports a finding that BGS was relying on Ritrama's skill or judgment to choose the right product. Instead, the undisputed evidence indicates that BGS chose the 670 series cast vinyl product with 700 or 720 adhesive because Keystone demanded it. Keystone and BGS chose the product, not Ritrama.

BGS contends that Ritrama represented that the 670 series cast vinyl was "engineered for use" on RVs. However, the Spec Guide said that the vinyl was engineered for use "where extended outdoor durability is required." The Spec Guide acknowledged that the product was used on RVs but did not suggest that Ritrama was recommending the product for what BGS wanted to do with it. Again, the evidence indicates that BGS chose the 670 series cast vinyl with 700 or 720 adhesive because Keystone demanded it. Thus, partial summary judgment will be granted on the claim of implied warranty of fitness for a particular purpose.

C.    Breach of Contract Claim

In claim III, BGS asserts that Ritrama's contract requires it "to hold Burlington forever harmless from and against any and all liability for losses, damages and expenses (including, but not limited to, reasonable attorney fees) incurred or arising out of or by reason of the failure of Ritrama's vinyl to comply with its specifications or with Ritrama's express or implied warranties." (Doc. 1, ¶¶ 64.) The language quoted appears in *Ritrama's* form Purchase Order Terms and Conditions. (*See* Doc. 36, Ex. U at 3, ¶ 14.) BGS cites no other document from which such terms arise.

A breach of contract claim requires the existence of a valid contract. And a valid contract requires an offer, acceptance, and consideration. *Briggs v. Miller*, 176 Wis. 321, 186 N.W. 163, 164 (1922). An offer is "the manifestation of willingness to enter into a bargain, made to justify another person's understanding that assent to that bargain is invited and will create a contract." *Alliance Laundry Sys. LLC v. Stroh Die Casting Co.*, 2008 WI App 180, ¶ 32, 315 Wis. 2d 143, ¶ 32, 763 N.W.2d 167, ¶ 32. A definite

36

expression of acceptance or a written confirmation operates as an acceptance. Wis. Stat. § 402.207.

BGS purchased cast vinyl from Ritrama by use of *BGS's* purchase orders, which did not contain terms and conditions other than quantity ordered, the item description, price, payment terms, and required date. (*See, e.g.*, Doc. 39, Ex. B at 1, 4.) Ordinarily, Ritrama responded to BGS's purchase orders with Sales Order Acknowledgments, whether or not they contained the back-side Conditions of Sale. Even taking the facts in BGS's favor that Ritrama sent its own Purchase Order Terms and Conditions in response to a BGS purchase order on the back side of one or more Sales Order Acknowledgments (whether instead of or in addition to its Conditions of Sale), no reasonable jury would find that it related to fulfillment of BGS's purchase order. The Purchase Order Terms and Conditions referred to "[t]his Purchase Order," yet apparently was printed on the back-side or was accompanied by a document from Ritrama that was titled as a *sales* order. Thus, treating Ritrama's Purchase Order Terms and Conditions as setting forth the terms for the sales order is not a coherent interpretation of the terms. Further, Ritrama's Purchase Order Terms and Conditions stated that "[t]his Purchase Order must be accepted on its exact terms," yet there was nothing for BGS left to accept—Ritrama had accepted BGS's offer already. The Purchase Order Terms and Conditions state that shipment of products described in the document "shall be conclusively deemed an unconditional acceptance of this Purchase Order" (*id.*), yet BGS was shipping no goods to Ritrama.

Further, in response to Ritrama's evidence indicating that transmission of its Purchase Order Terms and Conditions was a mistake, BGS has provided no evidence

37

indicating that it thought differently at the time of purchase and sale, that it believed the terms in Ritrama's Purchase Order Terms and Conditions applied, or that it took any action subsequent to receipt of products to accept Ritrama's Purchase Order Terms and Conditions or act in accord with them. Edwards testified at deposition, that BGS submitted its own purchase order form to Ritrama when it wanted to buy cast vinyl. Therefore, partial summary judgment will be granted as to this claim.

CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Ritrama's motion for partial summary judgment (Doc. 33) is granted as to the claims of implied warranty of fitness for a particular purpose and breach of contract, but denied as to the remainder.

IT IS ORDERED that a telephonic status conference is set for September 8, 2015, at 2:30 p.m., to discuss further proceedings and scheduling of trial. The court will place the call; counsel are directed to inform the court as to who will participate in the call and those attorneys' direct telephone numbers.

Dated at Milwaukee, Wisconsin, this 24th day of July, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE